UNITED STATES DISTRIC COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| NATHAN WEBSTER, | |
| Plaintiff | |
| v. | JURY TRIAL REQUESTED |
| UNIVERSITY OF NEW HAMPSHIRE | |
| Defendant, | |
| EDWARD MUELLER, | |
| Defendant, | |
| DAVID KELLAM, | |
| Defendant, and | |
| LISA MILLER, | |
| Defendant | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMPLAINT

I.     INTRODUCTION

This is a USERRA and ADEA complaint.  The Plaintiff, Nathan Webster, is a veteran, a journalist, and he was an outstanding educator in the English Department at UNH.  In 2018, Mr. Webster complained that his Lecturer of English contract at UNH was not renewed due to his veteran status.  Afterward, Mr. Webster applied for several other positions at UNH, and though he was qualified for these positions, he was denied employment.  An interviewer told Mr. Webster that he didn't think that Mr. Webster would fit in to an academic culture of "safety"

1

given Mr. Webster's military background.   Another interviewer, for a Publication Editor position, queried whether Mr. Webster could function autonomously in the workplace, given that he had previously worked in a "top down chain of command."   Mr. Webster was also denied employment because his interviewers believed that he, at age 51, would not be effective working with undergraduates.

II.      PARTIES

1.       The Plaintiff, Nathan Webster, is a resident of Stratham, New Hampshire.

2.       The Plaintiff is 51 years old.

3.       Defendant, University of New Hampshire ["UNH"], is a state-chartered (legislative) corporation which is registered and has its principal place of business in New Hampshire.

4.       The University of New Hampshire is a component of the University System of New Hampshire (USNH), a system of public higher education, which is also a state-chartered legislative corporation, and which is governed by an independent Board of Trustees.  See University System of New Hampshire v. US Gypsum, 756 F. Supp. 640 (D.N.H. 1991).

5.       The USNH Board of Trustees has the power to sue and be sued, enter into contracts, and it has "broad authority" to manage USNH and UNH independently from the State of New Hampshire.  See id.

6.       USNH and UNH also have a funding source which is separate from the state treasury. See id.

7.       UNH employs greater than 20 employees.

8.       Edward Mueller, a resident of New Hampshire, is the Director of the UNH's Writing Programs.

2

9. David Kellam is employed by UNH's Cooperative Extension as its Manager of Marketing and Communications. Upon information and belief, Mr. Kellam resides in New Hampshire.

10. Lisa Miller is an Associate Professor in the English Department at UNH's College of Liberal Arts. Upon information and belief, Ms. Miller resides in New Hampshire.

III. JURISDICTION AND VENUE

11. This Court has jurisdiction over the Plaintiff's USERRA and ADEA claims pursuant to 28 U.S.C. § 1331, providing for the district court's original jurisdiction over civil actions arising from the laws of the United States.

12. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §1391(b)(2) because the Plaintiff's injuries occurred in New Hampshire.

IV. STATEMENT OF FACTS

**Mr. Webster's Background**

13. Nathan Webster was an active duty service member in the United States Army from 1987 to 1992.

14. During this period, Mr. Webster trained to be, and became, an army journalist.

15. In 1990 and 1991, Mr. Webster was deployed to Iraq during Operation Desert Storm. He served as a combat photographer alongside the 82nd Airborne Division.

16. In 1990, Mr. Webster won the Journalist of the Year Award for the Military District of Washington.

17. Mr. Webster was honorably discharged from active duty military service in 1992, and he subsequently served in the US Army Reserve and New Hampshire National Guard from 1992-1999.

18. In 1995, Mr. Webster obtained his Bachelor's of Arts in Communications from UNH.

19. From 1994-2000, Mr. Webster worked as a reporter for both the New Hampshire Union Leader and the Sun Chronicle, in Attleboro, Massachusetts.

20. From 1998 – 1999, Mr. Webster edited the award-winning, NH National Guard magazine.

21. Between 2007 and 2009, Mr. Webster again worked as an embedded journalist with active duty military personnel in Iraq.

22. From 2006 to 2009, Mr. Webster was an M.F.A. candidate in UNH's Nonfiction Writing program.

23. As a graduate instructor in this program, Mr. Webster taught undergraduates in multiple writing courses.

24. Mr. Webster's M.F.A. thesis, "Can't Give This War Away: Three Iraqi Summers of Change and Conflict" won the 2009 UNH Journalism Prize for excellence.

25. Mr. Webster went on to publish many pieces in national publications, such as <u>The Daily Beast</u> and <u>The New York Times</u>.

26. UNH hired Mr. Webster to be first an adjunct professor, then a Lecturer of English (a promotion), in its College of Liberal Arts ["COLA"] English Department.

27. Mr. Webster worked as an instructor in the English Department for approximately nine years, or from Fall 2009 to Spring 2018.

28. Throughout his tenure in the English Department, of Mr. Webster received "exceeds expectations" performance reviews, from students and supervising colleagues alike.

**Mr. Webster's USERRA Grievance**

4

29. In or around November 2017, Lecturers within COLA were informed that several who held contracts expiring at the close of the Spring 2018 semester would not have their contracts renewed, pending decision-making by Dean Heidi Bostic, Dean of COLA.

30. Mr. Webster, along with English Department Chair, Rachel Trubowitz, advocated to Brett Gibson, Ms. Bostic's Associate Dean, for renewal of Mr. Webster's contract as his was expiring at the end of the Spring 2018 semester.

31. Dr. Trubowitz and Mr. Webster cited Mr. Webster's excellent performance history, and the diversity and insight that his military service brought to instruction in the humanities, particularly as he was the only veteran in the English Department and where he taught first-year writing classes that typically included newly-enrolled, veteran students.

32. Dean Gibson promised to relay his conversation with Dr. Trubowtiz and Mr. Webster to Dean Bostic.

33. In January 2018, Dean Bostic notified Mr. Webster that his contract was not being renewed.

34. Mr. Webster appealed to Dean Bostic, citing again the diversity and wealth of experience that he, as a veteran, brought to his writing classes.

35. Dean Bostic instantly responded negatively to Mr. Webster's suggestions that his military service benefitted UNH and its students. She asked, rhetorically to the effect of "do you [actually] think you are entitled [as a veteran] to a job?"

36. Dean Bostic also contacted Dr. Trubowitz to warn her that she should not be bringing up Mr. Webster's veteran status in advocacy for him. She added threatening words to the effect of "this could go very badly for you, Rachel."

37. After learning of this communication, and that Dean Bostic was upholding her decision to not renew his contract, Mr. Webster filed a union grievance asserting that his veteran status had negatively influenced Dean Bostic's decision with regard to his contract renewal.

38. Mr. Webster also filed a complaint with the United States Department of Labor ["DOL"], alleging that his veteran status influenced Dean Bostic's decision to not renew his contract.

39. The DOL actively investigated this complaint, including by interviewing several employees within the English Department.

40. A decision with regard to the DOL complaint remains pending.

**Mr. Webster Applies For and is Denied Employment at the UNH Writing Center**

41. In or around February 2018, Mr. Webster contacted Edward Mueller, Director of the UNH Writing Center, to inquire whether Mr. Mueller knew of any job openings in higher education in southern New Hampshire.

42. Mr. Mueller is a veteran, and Mr. Webster informed Mr. Mueller of his veteran status.

43. Mr. Webster also informed Mr. Mueller of the circumstances of his Lecturer contract non-renewal, and that he suspected that Dean Bostic had discriminated against him based on his veteran status.

44. Mr. Webster further communicated to Mr. Mueller his plan to file a grievance with UNH, and a complaint with the DOL, alleging that Dean Bostic's disregard for veterans influenced her decision to not renew his contract.

45. Mr. Mueller responded that he would attempt to connect Mr. Webster with available positions outside of UNH.

6

46. In August of 2018, Mr. Webster applied for the position of Senior Program Assistant with the UNH Writing Center, a center intended, generally, to assist undergraduates in writing for their courses.

47. Mr. Webster was interviewed for this position, on or about August 20, 2018, by three graduate students employed at the Center.

48. At the interview, a graduate student asked Mr. Webster, "I know you have military experience and a military background and I'm wondering how that would fit into this culture, because it's really important to me that we have a welcoming safe space for students to collaborate and work together in a positive way. Ed [Mueller] is a veteran, but *he* knows how to act within this culture."

49. Mr. Webster was taken aback by the implication that veterans ordinarily behave in a way that would disrupt an environment of safety, positivity, and collaboration. However, he explained to his interviewers that he *would* fit in to such an environment, because he understood working with students due to his lengthy and successful career in the classroom.

50. Shortly after the interview, Mr. Mueller emailed Mr. Webster to inform him that he was not selected for the Senior Program Assistant position and that the Center had instead hired a candidate who more "closely match[ed] the requirements of the position and needs of the department."

51. Mr. Webster filed a complaint with UNH's Equity Office, calling its attention to the comment made by the graduate student, suggesting that veterans do not know "how to act" in a way that fosters, safety, positivity, and collaboration.

52. Mr. Webster raised concern that the interviewer's anti-military bias influenced his recommendation to Mr. Mueller to not hire him.

7

53. The Equity Office investigated and found that, indeed, the comment had been made and that it was improper.

54. The Office recommended that the Writing Center undergo training to correct the anti-military bias reflected in the interviewer's comment.

55. The Office concluded, however, that this bias played no role in the decision to not hire Mr. Webster because, it reasoned, Mr. Mueller had made the hiring decision for the Senior Program Assistant position based on the "ability [of the candidate] to assist students in the Writing Center in a non-threatening, peer-to-peer, empathetic and sympathetic way."

56. In other words, while trying to absolve Mr. Mueller and the Center of liability stemming from a hiring decision based on a stereotype that veterans are not "safe", "welcoming", "positive", or "collaborative," the Office actually *affirmed* that the stereotype motivated the decision not to hire Mr. Webster, by conceding that Mr. Webster was not hired because he was viewed as being "threatening" and not "sympathetic" or "empathetic."

57. Moreover, the Office indicated that Mr. Webster was not hired due to his age of 51. The Office stated that Mr. Webster was not hired due to his inability to provide "peer" assistance to college undergraduates, who are typically under the age of 25.

58. Mr. Mueller and the Writing Center hired, upon information and belief, a person for the Senior Program Assistant position who was between the ages of 25 to 27, and who did not have a military background or a history of filing complaints against UNH.

59. Mr. Webster filed a second complaint with the DOL, alleging that the failure to hire him to the Senior Program Assistant Position at the Writing Center was motivated by anti-veteran bias, which also remains pending.

60. Mr. Webster also timely filed a charge of age discrimination with the EEOC.

61.     The EEOC issued Mr. Webster a Notice of Right to Sue, and this complaint is timely filed in accordance with the requirements of the Notice.

**Mr. Webster Applies For and is Denied Employment at UNH Cooperative Extension**

62.     In or around April of 2019, Mr. Webster applied for the position of Marketing and Communications Production Editor with the UNH Cooperative Extension.

63.     UNH Cooperative Extension oversees non-formal, educational programming in each of New Hampshire's counties.  The programming is in a variety of subject areas to include business development and retention, youth and family resiliency, and community and economic development, and the programming includes specialized programs for military personnel and their families.

64.     Mr. Webster was qualified for the Production Editor position based on his experience as a journalist, magazine editor, writer, and educator.

65.     Mr. Webster's military service background also made him uniquely suited to market to and communicate with the approximate 110,000 veterans living in the counties of New Hampshire.

66.     Mr. Webster highlighted all of these attributes in a cover letter and resume that he submitted online to the Cooperative Extension via HigherEdJobs.

67.     On April 15, 2019, Mr. Webster had a phone interview with David Kellam, Marketing and Communications Manager for the Cooperative Extension.

68.     After Mr. Webster discussed his work experience relevant to the job requirements listed on the Production Editor job description, including his experience writing, editing, and designing publications as an army journalist and editor for the NH National Guard magazine, Mr. Kellam gave Mr. Webster the opportunity to ask *him* questions about the position.

69. Mr. Webster asked if Mr. Kellam perceived any "gaps," meaning in qualification for the position, in his resume.

70. Mr. Kellam stated that he liked the question because it provided the interviewee an opportunity to address "potential areas of concern."

71. Mr. Kellam next said that the Extension office operated in an autonomous fashion. He raised cited an example, that staff had the discretion to post online content without going through a supervisory approval process. The office was not "top-down," Mr. Kellam explained.

72. Mr. Kellam then further explained that his father was in the army, and that his concern was that the military operated a top-down chain of command where independent behavior is frowned upon.

73. Ultimately, Mr. Kellam stated to the effect that he was concerned that *Mr. Webster's* military background would make it difficult for him to operate independently at the Extension.

74. Mr. Webster was, again, inwardly shocked that his military service was being raised as a *dis*qualifier for employment.

75. Mr. Webster felt compelled to distance himself from his honorable wartime military service. He reminded Mr. Kellam that he was in the military "a long time ago," as if referring to some youthful indiscretion.

76. Mr. Webster was placed in an untenable Catch 22, because dismissing his military service meant dismissing the work experience where he had honed skills directly relevant to the Editor position at hand.

77. On May 7, 2019 Mr. Kellam notified Mr. Webster by email that he was not selected for the Production Editor position.

78. Mr. Webster later learned that a candidate without a military background was selected for the position.

79. Mr. Webster filed a third complaint with the DOL, alleging that his veteran status was considered a factor weighing against him for employment in the Publication Editor position and that he consequently was not hired to the position. This complaint remains pending.

**Mr. Webster Applies For and is Denied Employment as a Journalism Lecturer**

80. In or around 2012, long before the non-renewal of Mr. Webster's Lecturer of English contract and his subsequent grievance and DOL complaints, Mr. Webster was interviewed for an Assistant Professor of Journalism position within the COLA English Department.

81. Mr. Webster was not hired for this position, but in the years subsequent to his interview, he gained considerable work experience as both a journalist and a teacher. See paragraphs 25 – 28, supra.

82. For example, Mr. Webster taught Introduction to Journalism at UNH Manchester; continued to publish in a variety of publications; and he brought authors and photojournalism exhibitions to UNH.

83. Among Mr. Webster's interviewers for the Assistant Professor of Journalism position was Lisa Miller, who was Mr. Webster's colleague in the English Department from 2009 to 2018, and who was familiar with the quality of Mr. Webster's work during that time.

84. In fact, Lisa Miller interviewed and recommended Mr. Webster for his *promotion,* from Adjunct Professor to the Lecturer of English position, in 2014.

85. In April of *2019*, or approximately six months *after* Mr. Webster filed his DOL complaints relating to the non-renewal of his Lecturer of English contract and the Writing Center's failure to hire him, and after the DOL actively interviewed English Department

employees, at least pursuant to the complaint relating to the Lecturer of English contract non-renewal, Mr. Webster applied for a vacant *Journalism* Lecturer position within the English Department.

86. The Journalism Lecturer position had *lesser* status within the Department than the Assistant Professor of Journalism position for which he interviewed in 2012.

87. Ms. Miller received Mr. Webster's application for the Journalism Lecturer position, and despite that she was aware of Mr. Webster's superior credentials, and that the position carried *lesser* status than the Assistant Professor of Journalism position for which she interviewed Mr. Webster in 2012, Ms. Miller elected to not even *interview* Mr. Webster for the Journalism Lecturer position.

88. The person hired for the Journalism Lecturer position did not have a military background or a history of filing complaints at COLA.

## COUNT I – Against Defendants UNH and Edward Mueller
## Violation of 38 U.S.C § 4311(a)

89. The preceding paragraphs are re-alleged and incorporated herein.

90. It is unlawful for **a** person who has performed in a uniformed service to be denied initial employment on the basis of his or her performance of uniformed service. 38 U.S.C § 4311(a).

91. Under 38 U.S.C. § 4303, 4(A), an "employer" includes any natural person that has control over employment opportunities. See also Bello v. Vill. of Skokie, No. 14 C 1718, 2015 U.S. Dist. LEXIS 173354 (N.D. Ill. Dec. 31, 2015).

92. Mr. Webster's uniformed service was a motivating factor in the Writing Center's and Mr. Mueller's decision to not hire him for the Senior Program Assistant Position, where UNH, itself, investigated and determined that anti-military comments were made to Mr. Webster in his interview for the position, and that the Writing Center and Mr. Mueller decided not the hire Mr.

12

Webster because they perceived that he could be "threatening" and not "sympathetic" or "empathetic" in the position.

93. Mr. Webster suffered damages due to the Writing Center's and Mr. Mueller's failure to hire him.

### COUNT II – Against Defendants UNH and Edward Mueller
### Violation of 38 U.S.C § 4311(b)

94. The preceding paragraphs are re-alleged and incorporated herein.

95. An employer may not discriminate in employment against any person because such person has taken an action to enforce a protection afforded any person under 38 U.S.C. §4311 (a) or has exercised a right provided for 38 U.S.C. §4311 (a).

96. UNH and Mr. Mueller had knowledge of Mr. Webster's grievance and complaint, that his Lecturer of English contract was not-renewed due to his veteran status.

97. UNH and Mr. Mueller chose not to hire Mr. Webster because he grieved and complained in exercise of his rights under USERRA.

98. Mr. Webster suffered damages due to the Writing Center's and Mr. Mueller's decision not to hire him.

### COUNT III – Against Defendant UNH
### Violation of 29 U.S.C. § 623 (a)(1)

98. The preceding paragraphs are re-alleged and incorporated herein.

99. It is unlawful to fail or refuse to hire any individual because of such individual's age.

100. UNH failed or refused to hire Mr. Webster for the Senior Program Assistant position within its Writing Center because, though he was otherwise qualified for the position, he was 51 years old and not therefore a "peer" of younger undergraduates making use of the Writing Center.

101.   UNH filled the Senior Program Assistant position with an employee in her mid-twenties.

102.   UNH's failure or refusal to hire Mr. Webster has caused him damages.

### COUNT IV – Against Defendants UNH and David Kellam
### Violation of 38 U.S.C § 4311(a)

103.   The preceding paragraphs are re-alleged and incorporated herein.

104.   It is unlawful for **a** person who has performed in a uniformed service to be denied initial employment on the basis of his or her performance of uniformed service.  38 U.S.C § 4311(a).

105.   Under 38 U.S.C. § 4303, 4(A), an "employer" includes any natural person that has control over employment opportunities.  See also Bello v. Vill. of Skokie, No. 14 C 1718, 2015 U.S. Dist. LEXIS 173354 (N.D. Ill. Dec. 31, 2015).

106.   Mr. Webster's uniformed service was a motivating factor in the Cooperative Extension's and Mr. Kellam's decision not to hire him for the Publication Editor position, where Mr. Kellam made derogatory statements about military service in his interview of Mr. Webster, compelling Mr. Webster to disassociate himself from his military work experience that directly related to, and qualified him for, the Publication Editor position.

107.   Mr. Webster suffered damages due to the Writing Center's and Mr. Mueller's failure to hire him.

### COUNT V – Against Defendants UNH and Lisa Miller
### Violation of 38 U.S.C § 4311(b)

108.   The preceding paragraphs are re-alleged and incorporated herein.

109.   An employer may not discriminate in employment against any person because such person has taken an action to enforce a protection afforded any person under 38 U.S.C. §4311 (a) or has exercised a right provided for 38 U.S.C. §4311 (a).

110.   Under 38 U.S.C. § 4303, 4(A), an "employer" includes any natural person that has control over employment opportunities.  See also Bello v. Vill. of Skokie, No. 14 C 1718, 2015 U.S. Dist. LEXIS 173354 (N.D. Ill. Dec. 31, 2015).

111.   UNH and Ms. Miller had knowledge of Mr. Webster's complaints to the DOL, that his Lecturer of English contract was not renewed due to his veteran status and that he was denied a job in the Writing Center due to his veteran status.

112.   UNH and Ms. Miller chose not to hire Mr. Webster because he toke action and complained in exercise of his rights under USERRA.

113.   Mr. Webster suffered damages due to UNH and Ms. Miller's decision not to hire him.

WHEREFORE, the Plaintiff, Mr. Webster, respectfully prays that this Honorable Court:

    A.   Schedule this matter for trial by jury, and after trial;

    B.   Order employment of the Plaintiff after trial;

    C.   Award the Plaintiff damages for his economic losses, including without limitation lost wages (back and front pay), lost employment benefits, and lost earning capacity;

    D.   Award the Plaintiff compensatory damages, including without limitation emotional distress, humiliation, inconvenience and loss of enjoyment of life;

    E.   Award the Plaintiff liquidated damages;

    F.   Award the Plaintiff punitive damages;

    G.   Award the Plaintiff his reasonable attorney's fees;

    H.   Award the Plaintiff interest and costs;

    I.   Award all other damages available to the Plaintiff at law, and

    J.   Award the Plaintiff such other relief as this honorable court deems equitable and just.

...

                        Respectfully submitted,

                        NATHAN WEBSTER,

                        By his attorneys,

                        DOUGLAS, LEONARD & GARVEY, P.C.

Date: September 30, 2019      By:    /s/ Megan Douglass
                                                  Megan Douglass #19501
                                                  14 South Street, Suite 5
                                                  Concord, NH 03301
                                                  (603) 224-1988
                                                  mdouglass@nhlawoffice.com