UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| NATHAN WEBSTER, | |
| Plaintiff | |
| v. | JURY TRIAL REQUESTED |
| UNIVERSITY OF NEW HAMPSHIRE | |
| Defendant, | Case No: 1:19-cv-01040-LM |
| EDWARD MUELLER, | |
| Defendant, | |
| DAVID KELLAM, | |
| Defendant, and | |
| LISA MILLER, | |
| Defendant | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>FIRST AMENDED COMPLAINT</u>

I.   INTRODUCTION

This is a USERRA and ADEA complaint.  The Plaintiff, Nathan Webster, is a veteran, a journalist, and he was an outstanding educator in the English Department at UNH.  In 2018, Mr. Webster complained that his Lecturer of English contract at UNH was not renewed due to his veteran status.  Afterward, Mr. Webster applied for several other positions at UNH, and though he was qualified for these positions, he was denied employment.  An interviewer told Mr. Webster that he didn't think that Mr. Webster would fit into an academic culture of "safety" given Mr. Webster's military background.   Another interviewer, for a Publication Editor position, queried whether Mr.

1

Webster could function autonomously in the workplace, given that he had previously worked in a "top down chain of command." Mr. Webster was also denied employment because his interviewers believed that he, at age 51, would not be effective working with undergraduates.

II. PARTIES

1. The Plaintiff, Nathan Webster, is a resident of Stratham, New Hampshire.

2. The Plaintiff is 51 years old.

3. Defendant, University of New Hampshire ["UNH"], is a state-chartered (legislative) corporation which is registered and has its principal place of business in New Hampshire.

4. UNH is a component of the University System of New Hampshire (USNH), a system of public higher education, which is also a state-chartered legislative corporation, and which is governed by an independent Board of Trustees. See University System of New Hampshire v. US Gypsum, 756 F. Supp. 640 (D.N.H. 1991).

5. The USNH Board of Trustees has the power to sue and be sued, enter into contracts, and it has "broad authority" to manage USNH and UNH independently from the State of New Hampshire. See id.

6. USNH and UNH also have a funding source which is separate from the state treasury. See id.

7. UNH employs greater than 20 employees.

8. Edward Mueller, a resident of New Hampshire, is the Director of the UNH's Writing Programs.

9. David Kellam is employed by UNH's Cooperative Extension as its Manager of Marketing and Communications. Upon information and belief, Mr. Kellam resides in New Hampshire.

10. Lisa Miller is an Associate Professor in the English Department at UNH's College of Liberal Arts. Upon information and belief, Ms. Miller resides in New Hampshire.

III. JURISDICTION AND VENUE

11. This Court has jurisdiction over the Plaintiff's USERRA and ADEA claims pursuant to 28 U.S.C. § 1331, providing for the district court's original jurisdiction over civil actions arising from the laws of the United States.

12. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §1391(b)(2) because the Plaintiff's injuries occurred in New Hampshire.

IV. STATEMENT OF FACTS

**Mr. Webster's Background**

13. Nathan Webster was an active duty service member in the United States Army from 1987 to 1992.

14. During this period, Mr. Webster trained to be, and became, an army journalist.

15. In 1990 and 1991, Mr. Webster was deployed to Iraq during Operation Desert Storm. He served as a combat photographer alongside the 82nd Airborne Division.

16. In 1990, Mr. Webster won the Journalist of the Year Award for the Military District of Washington.

17. Mr. Webster was honorably discharged from active duty military service in 1992, and he subsequently served in the US Army Reserves, from 1992-1994, and the New Hampshire National Guard, including duties under federal direction, from 1997-1999.

18. In 1995, Mr. Webster obtained his Bachelor's of Arts in Communications from UNH.

19. From 1994-2000, Mr. Webster worked as a reporter for both the New Hampshire Union Leader and the Sun Chronicle, in Attleboro, Massachusetts.

20. From 1998 – 1999, Mr. Webster edited the award-winning, NH National Guard magazine.

21. Between 2007 and 2009, Mr. Webster again reported on active duty military personnel as an embedded journalist in Iraq.

22. From 2006 to 2009, Mr. Webster was an M.F.A. candidate in UNH's Nonfiction Writing program.

23. As a graduate instructor in this program, Mr. Webster taught undergraduates in multiple writing courses.

24. Mr. Webster's M.F.A. thesis, "Can't Give This War Away: Three Iraqi Summers of Change and Conflict" won the 2009 UNH Journalism Prize for excellence.

25. Mr. Webster graduated in 2009 with his M.F.A. in Non-fiction Writing, a terminal degree, meaning the highest degree attainable in the subject area.

26. Mr. Webster went on to publish many pieces in national publications, such as <u>The Daily Beast</u> and <u>The New York Times</u>.

27. UNH hired Mr. Webster to be first an adjunct professor, then a Lecturer of English (a promotion), in its College of Liberal Arts ["COLA"] English Department.

28. Mr. Webster worked as an instructor in the English Department for approximately nine years, or from Fall 2009 to Spring 2018.

29. Throughout his tenure in the English Department, Mr. Webster received "exceeds expectations" performance reviews, from students and supervising colleagues alike.

**Mr. Webster's Union Grievance and U.S. DOL Complaint**

30. In or around November 2017, Lecturers within COLA were informed that several who held contracts expiring at the close of the Spring 2018 semester would <u>not</u> have their contracts renewed, pending decision-making by Dean Heidi Bostic, Dean of COLA.

31. Mr. Webster, along with English Department Chair, Rachel Trubowitz, advocated to Brett Gibson, Ms. Bostic's Associate Dean, for renewal of Mr. Webster's contract as his was expiring at the end of the Spring 2018 semester.

32. Dr. Trubowitz and Mr. Webster cited Mr. Webster's excellent performance history, and the diversity and insight that his military service work brought to instruction in the humanities, particularly as he was the only veteran in the English Department and where he taught first-year writing classes that typically included newly-enrolled, veteran students.

33. Dean Gibson promised to relay his conversation with Dr. Trubowtiz and Mr. Webster to Dean Bostic.

34. In January 2018, Dean Bostic notified Mr. Webster that his contract was <u>not</u> being renewed.

35. Mr. Webster appealed to Dean Bostic, asking her if, in making her non-renewal decision, she had considered the insight his military background and experience brought to his classroom instruction.

36. Mr. Webster's military journalism experience was directly and relevantly connected to his position as a writing instructor, because the military was where he honed his writing and editing skills, <u>and</u> the unique experiences he had as a *military* journalist afforded him broad perspective which in turn informed his teaching of undergraduate students.

37. Dean Bostic instantly responded negatively to Mr. Webster's suggestions that his military service benefitted UNH and its students. She said, bluntly, "I didn't consider your military background at all."

38. Mr. Webster responded to the effect of "what do you mean by that?" and Ms. Bostic responded to the effect of, "do you [actually] think you are entitled [as a veteran] to a job?"

39. Dean Bostic also contacted Dr. Trubowitz to warn her that she should <u>not</u> be bringing up Mr. Webster's veteran status in advocacy for him. She added threatening words to the effect of "this could go very badly for you, Rachel."

5

40. After learning of this communication, and that Dean Bostic was upholding her decision to not renew his contract, Mr. Webster, on or about March 7, 2018, filed a union grievance asserting that his veteran status negatively influenced Dean Bostic's decision with regard to his contract renewal.

41. Mr. Webster also filed a complaint with the United States Department of Labor ["DOL"], on or about October 12, 2018, alleging that his veteran status influenced Dean Bostic's decision to not renew his contract.

42. The DOL actively investigated this complaint, including by interviewing several employees within the English Department.

**Mr. Webster Applies For and is Denied Employment at the UNH Writing Center**

43. In or around February 2018, Mr. Webster contacted Edward Mueller, Director of the UNH Writing Center, a center intended, generally, to assist undergraduates in writing for their courses.

44. The Center is staffed by both full time professional staff and part-time graduate student employees.

45. Mr. Mueller is a veteran, and Mr. Webster informed Mr. Mueller of his veteran status.

46. Mr. Webster also informed Mr. Mueller of the circumstances of his Lecturer contract non-renewal, and that he suspected that Dean Bostic had discriminated against him based on his veteran status.

47. Mr. Webster communicated his plan to file a grievance with UNH, and a complaint with the DOL, alleging that Dean Bostic's disregard for military service work influenced her decision to not renew his contract.

48. Mr. Webster also inquired whether Mr. Mueller knew of any job openings in higher education in southern New Hampshire.

49. Mr. Mueller responded that he would attempt to connect Mr. Webster with available positions outside of UNH.

50. Mr. Mueller also advised that there was the possibility that a position would become available in the Writing Center.

51. On or about March 5, 2018, Mr. Mueller advised that he would keep Mr. Webster informed of the process for obtaining any jobs at the Writing Center.

52. On March 7, 2018, Mr. Webster went ahead with his plan to <u>fully grieve</u> the non-renewal of Lecturer contract based on his veteran status.

53. Thereafter, Mr. Mueller did <u>not</u> alert Mr. Webster to the posting of an open Senior Program Assistant position at the Writing Center. Instead, in August of 2018, Mr. Webster discovered the posted vacancy on his own.

54. Mr. Webster applied for the position and was interviewed, on or about August 20, 2018, by three graduate students employed at the Center. Mr. Mueller was <u>not</u> present at this interview.

55. The graduate students were expected to vet candidates for the position and provide their hiring recommendations to Mr. Mueller.

56. Mr. Mueller put great weight in the recommendations of his graduate student employees.

57. Mr. Mueller previously rejected a candidate for fulltime work in the Writing Center because the candidate "scared" the graduate students.

58. At Mr. Webster's interview, a graduate student stated to Mr. Webster, as a non sequitur, "I know you have military experience and a military background and I'm wondering how that would fit into this culture, because it's really important to me that we have a welcoming safe space for students to collaborate and work together in a positive way. Ed [Mueller] is a veteran, but *he* knows how to act within this culture."

59. Mr. Webster was taken aback by the implication that veterans ordinarily behave in a way which would disrupt an environment of safety, positivity, and collaboration. However, he explained to his

interviewers that he *would* fit into such an environment, because he understood working with students due to his lengthy and successful career in the classroom.

60.     Upon information and belief, the graduate student, who made the anti-military comments, due to his anti-military bias, provided Mr. Mueller with his *negative opinion* of Mr. Webster, and Mr. Mueller relied on this negative opinion to form his decision to <u>not</u> offer the position to Mr. Webster.

61.     Shortly after the interview, Mr. Mueller emailed Mr. Webster to inform him that he was <u>not</u> selected for the Senior Program Assistant position and that the Center had instead hired a candidate who more "closely match[ed] the requirements of the position and needs of the department."

62.     Mr. Webster filed a complaint with UNH's Equity Office, calling its attention to the comments made by the graduate student in his interview, namely: "I know you have <u>military experience</u> and <u>a military background</u> and I'm wondering how that <u>would fit into</u> this culture, because it's really important to me that we have a <u>welcoming safe space</u> for students to <u>collaborate</u> and work together in a <u>positive</u> way.  Ed [Mueller] is a <u>veteran</u>, but *he* knows <u>how to act within this culture</u>." (Emphasis added).

63.     In his complaint, Mr. Webster raised concern that the graduate student interviewer's anti-military bias influenced his recommendation to Mr. Mueller to <u>not</u> hire him.

64.     The Equity Office investigated and found that, <u>in fact</u>, the graduate student <u>did make the alleged anti-military discriminatory comments to Mr. Webster in his interview</u>, to wit the discriminatory comments expressing <u>doubt</u> that Mr. Webster would "know how to act" so as to "fit into" the "safe", "collaborative", and "positive" culture of Writing Center, given that he was a "veteran" with "military experience" and a "military background." <u>See Attached Exhibit A.</u>

65.     The Office even recommended that the Writing Center <u>undergo training</u> to correct the anti-military bias reflected in the interviewer's comment.  <u>See id.</u>

8

66. However, the Office concluded that anti-military bias could <u>not</u> have factored into the decision to reject Mr. Webster as a candidate because, it reasoned, Mr. Mueller made the hiring decision for the Senior Program Assistant position alone.

67. This conclusion was false, because Mr. Mueller considered the recommendations of the graduate student employees in making the hiring decision.

68. The Office also concluded that the hiring decision could <u>not</u> have involved veteran discrimination reasoning that the hiring decision was instead based on the "ability [of the candidate] to assist students in the Writing Center in a non-threatening, peer-to-peer, empathetic and sympathetic way." <u>See id.</u>

69. In other words, while trying to absolve Mr. Mueller and the Center of liability stemming from a hiring decision based on a stereotype that veterans are not "safe", "welcoming", "positive", or "collaborative," the Office actually *affirmed* that the stereotype motivated the decision not to hire Mr. Webster, by conceding that Mr. Webster was not hired because he was viewed as being "threatening" and not "sympathetic" or "empathetic."  <u>See id.</u>

70. Moreover, the Office suggested that Mr. Webster was not hired due to his age of 51. The Office stated that Mr. Webster was not hired due to his inability to provide "peer" assistance to college undergraduates, who are typically under the age of 25. <u>See id.</u>

71. Mr. Mueller and the Writing Center hired, upon information and belief, a person for the Senior Program Assistant position who was between the ages of 25 to 27, and who did <u>not</u> have a military background <u>or</u> a history of filing complaints against UNH.

72. This candidate was not officially selected until approximately a week after Mr. Webster's interview.

73. The hired candidate had qualifications equal to or lesser than those of Mr. Webster.  For example: the job required five to seven years of duties "involving increasing responsibility"; the hired

9

candidate had a work history involving short terms of employment, in various positions, *not* indicating "increasing" responsibility; but Mr. Webster showed a career path of escalating responsibility, as he had been a graduate instructor, an adjunct professor, and a contract lecturer, all at UNH.

74. In October 2018, Mr. Webster filed an additional complaint with the DOL, alleging that the failure to hire him to the Senior Program Assistant Position at the Writing Center was motivated by anti-veteran bias.

75. Mr. Webster also timely filed a charge of age discrimination with the EEOC.

76. The EEOC issued Mr. Webster a Notice of Right to Sue, and this complaint is timely filed in accordance with the requirements of the Notice.  See Exhibit B.

**Mr. Webster Applies For and is Denied Employment at UNH Cooperative Extension**

77. In or around April of 2019, Mr. Webster applied for the position of Marketing and Communications Production Editor with the UNH Cooperative Extension.

78. UNH Cooperative Extension oversees non-formal, educational programming in each of New Hampshire's counties.  The programming is in a variety of subject areas to include business development and retention, youth and family resiliency, and community and economic development, and the programming includes specialized programs for military personnel and their families.

79. Mr. Webster was qualified for the Production Editor position based on his experience as a journalist, magazine editor, writer, and educator.

80. Mr. Webster's military service background also made him uniquely suited to market to and communicate with the approximate 110,000 veterans living in the counties of New Hampshire.

81. Mr. Webster highlighted all of these attributes in a cover letter and resume that he submitted online to the Cooperative Extension via HigherEdJobs.

82. On April 15, 2019, Mr. Webster had a phone interview with David Kellam, Marketing and Communications Manager for the Cooperative Extension.

83. After Mr. Webster discussed his work experience relevant to the job requirements listed on the Production Editor job description, including his experience writing, editing, and designing publications as an army journalist and editor for the NH National Guard magazine, Mr. Kellam gave Mr. Webster the opportunity to ask *him* questions about the position.

84. Mr. Webster asked if Mr. Kellam perceived any "gaps," meaning in qualification for the position, in his resume.

85. Mr. Kellam stated that he liked the question because it provided the interviewee an opportunity to address "potential areas of concern."

86. Mr. Kellam next said that the Extension office operated in an autonomous fashion. He cited an example, that staff had the discretion to post online content without going through a supervisory approval process. The office was not "top-down," Mr. Kellam explained.

87. Mr. Kellam then further explained that his father was in the army, and that his concern was that the military operated a top-down chain of command where independent behavior is frowned upon.

88. Ultimately, Mr. Kellam stated to the effect that he was concerned that *Mr. Webster's* military background would make it difficult for him to operate independently at the Extension.

89. Mr. Webster was, again, inwardly shocked that his military service was being raised as a *dis*qualifier for employment.

90. Mr. Webster felt compelled to distance himself from his honorable wartime military service. He reminded Mr. Kellam that he was in the military "a long time ago," as if referring to some youthful indiscretion.

91. Mr. Webster was placed in an untenable Catch 22, because dismissing his military service meant dismissing the work experience where he had honed skills directly relevant to the Editor position at hand.

11

92.     On May 7, 2019 Mr. Kellam notified Mr. Webster by email that he was not selected for the Production Editor position.

93.     Mr. Webster later learned that a candidate without a military background was selected for the position.

94.     Mr. Webster filed another complaint with the DOL, alleging that his military work experience was considered a factor weighing against him for employment in the Publication Editor position and that he consequently was not hired to the position.

**Mr. Webster Applies For and is Denied Employment as a Journalism Lecturer**

95.     In or around 2011, long before the non-renewal of Mr. Webster's Lecturer of English contract and his subsequent grievance and DOL complaints, Mr. Webster was interviewed for an Assistant Professor of Journalism position within the COLA English Department.

96.     Mr. Webster was not hired for this position, but in the years subsequent to his interview, he gained considerable work experience as both a journalist and a teacher.  See paragraphs 25 – 28, supra.

97.     For example, Mr. Webster taught Introduction to Journalism at UNH Manchester; continued to publish in a variety of publications; and he brought authors and photojournalism exhibitions to UNH.

98.     Among Mr. Webster's interviewers for the Assistant Professor of Journalism position was Lisa Miller, Professor of Journalism, who was Mr. Webster's colleague in the English Department from 2009 to 2018, and who was familiar with the quality of Mr. Webster's work during that time.

99.     In fact, Lisa Miller was part of the interviewing committee that recommended Mr. Webster for his *promotion,* from Adjunct Professor to the Lecturer of English position, in 2014.

100.    Also among Mr. Webster's interviewers for the Assistant Professor of Journalism position was Susan Hertz, Associate Professor of Journalism.  Ms. Hertz was also Mr. Webster's colleague in the English Department and was aware of Mr. Webster's abilities.

101.     *Prior to* October 2018 (when Mr. Webster submitted his first two Department of Labor complaints, relating to his lecturer contract non-renewal and the non-hire at the Writing Center), there was a groundswell of support amongst professors in the COLA English Department for the retention of Mr. Webster in the English Department, either by keeping him in his original lecturer position or by hiring him to a different position.

102.     This rallying around keeping Mr. Webster employed included Ms. Miller and Ms. Hertz. For example, Ms. Miller attended meetings advocating for the renewal of Mr. Webster's lecturer contract, and Ms. Hertz emailed Mr. Webster to tell him she was advocating for his continued employment.

103.     However *after* the October 2018 complaint submissions, and after the DOL interviewed several English Department witnesses pursuant to at least the lecturer contract related complaint, Ms. Miller and Ms. Hertz ceased being vocal advocates for Mr. Webster.

104.      In April 2019, or approximately six months *after* Mr. Webster filed his October Department of Labor complaints (and after the DOL actively interviewed English Department employees), Mr. Webster applied for a vacant *Journalism* Lecturer position within the English Department.

105.     The Journalism Lecturer contract position had *lesser* status within the Department than the tenure track, Assistant Professor of Journalism position for which he interviewed in 2011.

106.     Both Ms. Miller and Ms. Hertz were on the hiring committee for the Journalism Lecturer position.

107.     Ms. Miller received Mr. Webster's application for the Journalism Lecturer position, on behalf of the hiring committee, and despite that she was aware of Mr. Webster's superior credentials, and that the position carried *lesser* status than the Assistant Professor of Journalism position for which she granted Mr. Webster an interview in 2011, she notified Mr. Webster, for the committee, the he would <u>not</u> even be *interviewed* for the Journalism Lecturer position.

108.  The person hired for the Journalism Lecturer position did not have a military background or a history of filing complaints at COLA.

### COUNT I – Against Defendants UNH and Edward Mueller
### Violation of 38 U.S.C § 4311(a) – USERRA Discrimination

109.  The preceding paragraphs are re-alleged and incorporated herein.

110.  It is unlawful for **a** person who has performed in a uniformed service to be denied initial employment on the basis of his or her performance of uniformed service.  See 38 U.S.C § 4311(a).

111.  Under 38 U.S.C. § 4303, (4)(A), an "employer" includes any natural person that has control over employment opportunities, including any person who "has denied initial employment in violation of section 4311."  See also Bello v. Vill. of Skokie, No. 14 C 1718, 2015 U.S. Dist. LEXIS 173354 (N.D. Ill. Dec. 31, 2015).

112.  Mr. Webster's uniformed service was a motivating factor in the Writing Center's and Mr. Mueller's decision to not hire him for the Senior Program Assistant Position, where UNH, itself, investigated and determined that anti-military comments were made to Mr. Webster in his interview for the position, and that the Writing Center and Mr. Mueller decided not the hire Mr. Webster because they perceived he would be "threatening," and not "sympathetic" or "empathetic" in the position.

113.  Even if Mr. Mueller did not make his decision to not hire Mr. Webster conscious that he was doing so based on Mr. Webster's military background and service, he did so due to *subconscious* bias premised on anti-military stereotype.

114.  Alternatively, Mr. Mueller was a "cat's paw," used by his graduate instructor employee to block the hiring of Mr. Webster, because the *graduate instructor* held animus toward Mr. Webster's military service.

115.  When an employer's agent, like UNH's graduate instructor, performs an act motivated by antimilitary animus, like recommending the non-hire of Mr. Webster, and that act is intended by the agent to cause the adverse employment action, and if that act is a proximate cause of the ultimate

14

employment action, then the employer, e.g. UNH, is liable under USERRA.  See <u>Staub v. Proctor Hosp.</u>, 562 U.S. 411, 422 (2011).

116. Here, Mr. Mueller gave great weight his graduate instructor's recommendation to <u>not</u> hire Mr. Webster, causing him to make the decision to not hire Mr. Webster.

117. Mr. Webster suffered damages due to the Writing Center's and Mr. Mueller's failure to hire him.

**COUNT II – Against Defendants UNH and Edward Mueller**
**Violation of 38 U.S.C § 4311(b) – USERRA Retaliation**

118. The preceding paragraphs are re-alleged and incorporated herein.

119. An employer may not discriminate in employment against any person because such person has taken an action to enforce a protection afforded any person under 38 U.S.C. §4311 (a) or has exercised a right provided for 38 U.S.C. §4311 (a).

120. UNH and Mr. Mueller had knowledge of Mr. Webster's grievance and complaint, that his Lecturer of English contract was not-renewed due to his veteran status.

121. UNH and Mr. Mueller chose <u>not</u> to hire Mr. Webster because he grieved and internally complained in exercise of his rights under USERRA.

122. The causal relationship between the decision to not hire Mr. Webster and his internal complaint (grievance) activity is shown by the change in Mr. Mueller's behavior, before and after Mr. Webster's grievance.

123.  Before Mr. Webster filed his March 7, 2018 grievance, that he was being discriminated against due to his veteran status, Mr. Mueller represented to Mr. Webster that he would assist him in finding work, including within his Writing Center.  After Mr. Webster filed his grievance,  Mr. Mueller failed to notify Mr. Webster of an opportunity for which he was qualified, within the Writing Center.  Though Mr. Webster discovered the position and applied anyway, Mr. Mueller refused to hire him.

124. Mr. Webster suffered damages due to the Writing Center's and Mr. Mueller's decision to not hire him.

## COUNT III – Against Defendant UNH
## Violation of 29 U.S.C. § 623 (a)(1) – Age Discrimination

125. The preceding paragraphs are re-alleged and incorporated herein.

126. It is unlawful to fail or refuse to hire any individual because of such individual's age.

127. A plaintiff in a discriminatory failure-to-hire case establishes a prima facie case, easily, by demonstrating that: (1) he is a member of a protected class, (2) he applied and was qualified for the position in question, (3) that despite his qualifications, he was rejected, and (4) that, after his rejection, the position remained open and the employer continued to seek applicants with plaintiff's qualifications.

128. UNH failed or refused to hire Mr. Webster for the Senior Program Assistant position within its Writing Center because, though he was otherwise qualified for the position, he was 51 years old and not therefore a "peer" of younger undergraduates making use of the Writing Center.

129. UNH elected to fill the Senior Program Assistant position, *after* Mr. Webster's interview, with an employee in her mid-twenties, who had the qualifications equal to or lesser than Mr. Webster's for the Senior Program Assistant role in the Writing Center.

130. UNH's failure or refusal to hire Mr. Webster has caused him damages.

## COUNT IV – Against Defendants UNH and David Kellam
## Violation of 38 U.S.C § 4311(a) - USERRA Discrimination

131. The preceding paragraphs are re-alleged and incorporated herein.

132. It is unlawful for **a** person who has performed in a uniformed service to be denied initial employment on the basis of his or her performance of uniformed service. 38 U.S.C § 4311(a).

133. Under 38 U.S.C. § 4303, 4(A), an "employer" includes any natural person that has control over employment opportunities, including any person who "has denied initial employment in violation of

16

section 4311." See also Bello v. Vill. of Skokie, No. 14 C 1718, 2015 U.S. Dist. LEXIS 173354 (N.D. Ill. Dec. 31, 2015).

134. Mr. Webster's uniformed service was a motivating factor in the Cooperative Extension's and Mr. Kellam's decision not to hire him for the Publication Editor position, where Mr. Kellam made derogatory statements about military service in his interview of Mr. Webster, compelling Mr. Webster to disassociate himself from his military work experience that directly related to, and qualified him for, the Publication Editor position.

135. Mr. Webster suffered damages due to the Co-operative Extension's and Mr. Kellam's failure to hire him.

## COUNT V – Against Defendants UNH and Lisa Miller
## Violation of 38 U.S.C § 4311(b) – USERRA Retaliation

136. The preceding paragraphs are re-alleged and incorporated herein.

137. An employer may not discriminate in employment against any person because such person has taken an action to enforce a protection afforded any person under 38 U.S.C. §4311 (a) or has exercised a right provided for 38 U.S.C. §4311 (a).

138. Under 38 U.S.C. § 4303, 4(A), an "employer" includes any natural person that has control over employment opportunities, including any person who "has denied initial employment in violation of section 4311." See also Bello v. Vill. of Skokie, No. 14 C 1718, 2015 U.S. Dist. LEXIS 173354 (N.D. Ill. Dec. 31, 2015).

139. UNH and Ms. Miller had knowledge of Mr. Webster's complaints to the DOL, that his Lecturer of English contract was not renewed due to his veteran status and that he was denied a job in the Writing Center due to his veteran status.

140. UNH and Ms. Miller chose not to hire Mr. Webster because he took action and complained in exercise of his rights under USERRA.

141.	The causal relationship between the decision to not hire Mr. Webster and his complaint activity is shown by the change in both Ms. Miller's and Susan Hertz's behavior *after* Mr. Webster submitted his complaints to the DOL in October 2018 and several of his colleagues in the English Department were interviewed.

142.	Prior to Mr. Webster's complaint activity, Miller and Hertz expressed support for Mr. Webster and a desire to assist him in maintaining employment within the COLA English Department.

143.	These communications ceased *after* Mr. Webster filed his complaints with the DOL, and Ms. Miller, on behalf of Ms. Hertz and others, notified Mr. Webster he would not even be interviewed, for a *lesser* position than that which they had interviewed him for several seven years earlier, *before* Mr. Webster had amassed considerably more journalism and teaching experience.

144.	Mr. Webster suffered damages due to UNH and Ms. Miller's decision not to hire him.

WHEREFORE, the Plaintiff, Mr. Webster, respectfully prays that this Honorable Court:

    A.	Schedule this matter for trial by jury, and after trial;

    B.	Order employment of the Plaintiff after trial;

    C.	Award the Plaintiff damages for his economic losses, including without limitation lost wages (back and front pay), lost employment benefits, and lost earning capacity;

    D.	Award the Plaintiff compensatory damages, including without limitation emotional distress, humiliation, inconvenience and loss of enjoyment of life;

    E.	Award the Plaintiff liquidated damages;

    F.	Award the Plaintiff punitive damages;

    G.	Award the Plaintiff his reasonable attorney's fees;

    H.	Award the Plaintiff interest and costs;

    I.	Award all other damages available to the Plaintiff at law, and

    J.	Award the Plaintiff such other relief as this court deems equitable and just.

|  |  |  |
|---|---|---|
|  |  | Respectfully submitted, |
|  |  | NATHAN WEBSTER, |
|  |  | By his attorneys, |
|  |  | DOUGLAS, LEONARD & GARVEY, P.C. |
| Date: October 19, 2019 | By: | /s/ <u>Megan Douglass</u><br>Megan Douglass #19501<br>14 South Street, Suite 5<br>Concord, NH 03301<br>(603) 224-1988<br>mdouglass@nhlawoffice.com |